Steven A. Berkowitz (0569)
Colin M. Schmitt (5303)
**STEVEN A. BERKOWITZ**
**& ASSOCIATES, P.C.**
**10000 Lincoln Drive East, Ste. 202**
**Marlton, NJ  08053**
**Phone: (856) 751-1860**
**Fax:  (856) 751-1677**
**sberkowitz@contractorlawoffices.com**
**ATTORNEY FOR PLAINTIFF**
**The Bedwell Company**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

| | |
|---|---|
| THE BEDWELL COMPANY, | )<br>)<br>) |
| Plaintiff, | )<br>) Civil Case No.: |
| vs. | )<br>) |
| CAMDEN COUNTY IMPROVEMENT<br>AUTHORITY and HDR ARCHITECTS and<br>ENGINEERS, P.C. as successor to CUH2A,<br>ARCHITECTS ENGINEERS PLANNERS,<br>P.C., | ) *CIVIL ACTION*<br>)<br>) *COMPLAINT*<br>)<br>)<br>)<br>) |
| Defendants. | )<br>)<br>) |

Plaintiff, The Bedwell Company, Inc. ("Bedwell"), located at 1380 Wilmington Pike,

West Chester, Pennsylvania 19382 by way of complaint against the Camden County

Improvement Authority ("CCIA"), with offices located at 1909 Route 70 East, Suite 300, Cherry

Hill, New Jersey, 08003 and  HDR Architects and Engineers, P.C. as successor to CUH2A ,

Architects Engineers Planners, P.C. ("HDR"), with headquarter offices located at 8404 Indian

Mills Drive, Omaha, Nebraska 68114-498, says:

## JURISDICTION AND VENUE

1.      This court has: (a) original jurisdiction over the claims within this Complaint, which arise under the laws of the State of New Jersey, pursuant to diversity jurisdiction under 28 U.S.C.A. § 1332(a)(1), in that the plaintiff and defendants are citizens of different states and the amount in controversy exceeds $75,000.00; and (b) supplemental jurisdiction over such remaining claims, pursuant to 28 U.S.C.A. § 1367(a), in that all claims within this Complaint are so related that they comprise one case, and all claims arise from the same operative facts.

2.      Venue is proper in this district under 18 U.S.C. § 1391(b) and (c).  Defendants, CCIA and HDR, are residents of the State of New Jersey.  All defendants transact business within this district.  The acts alleged herein took place within and without this district.  The location of the construction project germane to the underlying controversy involving the parties, for which Bedwell performed labor and furnished material, is in this district.

## PARTIES AND OTHER ACTORS

3.      Plaintiff repeats each and every preceding paragraph as if set forth at length herein.

4.      Plaintiff, Bedwell, is now, and was at all times herein mentioned, a Pennsylvania corporation in the business of, among other things, general contracting.

5.      Defendant, CCIA, is now, and was at all times herein mentioned, a public agency authorized by the Camden County Board of Freeholders to facilitate real estate development for local units, community organizations and not-for-profit entities.

6.      Defendant, HDR, is now, and was at all times herein mentioned, a New Jersey Professional Corporation licensed in the State of New Jersey to conduct business as an architect.

7.      Cooper Medical School of Rowan University ("Rowan") is the public medical school that was created by the executive order Governor of New Jersey as a partnership between Rowan University and Cooper University Hospital in June, 2009.

8.      University of Medicine and Dentistry of New Jersey ("UMDNJ") was the health sciences institution operated by the State of New Jersey that was dissolved by the New Jersey state legislature effective July 1, 2012.

9.      Joseph Jingoli and Son, Inc. ("JJS") is now, and was at all times herein mentioned, a private construction management company incorporated in the State of New Jersey.

## CONTRACTS AND RELATIONSHIPS

10.     UMDNJ entered into a design services agreement (the "Design Agreement") with HDR (then CUH2A) on September 8, 2006, to design certain medical facilities in Camden, New Jersey.

11.     In December of 2009, Rowan entered into a modification of the Design Agreement with HDR wherein HDR accepted UMDNJ's assignment of the Design Agreement to Rowan.

12.     Rowan demanded that the design of the structure change from 5 stories to 6 stories of a different configuration.

13.     As part of the aforementioned modification of the Design Agreement, HDR agreed to modify the design that had been created for UMDNJ to meet the revised plan of Rowan.

14.     In or about April of 2010, Rowan entered into a project development agreement (the "Project Development Agreement") with CCIA which identified CCIA as the exclusive

development and contracting agent for Rowan.

15.     The Project Development Agreement further provided that CCIA was to finalize the design of the project known as Cooper Medical School of Rowan University located at Broadway and Benson Streets in Camden, New Jersey (the "Project").

16.     The physical aspects of the Project consisted of a six story building plus seventh floor penthouse comprising approximately 200,000 square feet to be used as part of Rowan's Medical School.

17.     CCIA administered the Project by contracting directly with multiple prime contractors ("Prime Contractors") to perform the construction of an identified portion of the Project (i.e., structural work, mechanical work, electrical work, plumbing work, general construction work) with oversight of all portions by a construction manager.

18.     On July 30, 2010, CCIA entered into a contract with JJS to act as CCIA's construction manager for the Project.

19.     Deeming the design documents sufficiently complete, CCIA put the base structural portion of the Project out to bid in September of 2010.

20.     On or about September 27, 2010, Bedwell submitted a bid to CCIA for "Contract 2: General Construction – Foundations and Structural Steel" on the Project.

21.     On October 25, 2010, Bedwell entered into a contract with CCIA whereby Bedwell agreed to perform the portion of the Project that had previously been identified as Foundations and Structural Steel ("Contract #2") for the sum of $12,488,000.00.  A true and correct copy of the Contract #2 is attached hereto and marked as **Exhibit "A**."

22.     CCIA executed change orders to Bedwell authorizing performance of additional

work and/or altered work in the amount of $2,279,054.52 on Contract #2, thereby increasing the total adjusted sum of $14,767,054.52.

23. During the course of the Project, CCIA directed, authorized, required and/or demanded that Bedwell perform additional work or altered work valued in the amount of $802,479.27, and was not required to use contractual allowances of $89,900.60 for Contract #2, therefore the total value with all change orders and extra work increased to $15,479,633.19.

24. Deeming the design documents sufficiently complete, CCIA put the remaining portions of the Project out to bid in late 2009 or early 2010.

25. On or about February 23, 2011, Bedwell submitted a bid to CCIA for "Contract #3 – General Construction" on the "Project.

26. Bedwell's proposal for the Contract #3 stated that the proposed work would be:

> . . . in accordance with the published advertisement inviting proposals, will furnish all labor, material, equipment and service necessary for complete construction as defined in the advertisement, specimen contract, specification, drawings and proposal, for the contract amount indicated below for the COOPER MEDICAL SCHOOL OF ROWAN UNIVERSITY in strict accordance with the Contract Documents and Addenda thereto as prepared by [the architect].

27. On February 28, 2011, Bedwell entered into a contract with CCIA whereby Bedwell agreed to perform the "Portion of Work" on the Project identified as "Issue 3 – Contract 3 – General Construction" ("Contract #3") for the sum of $27,475,000.00. A true and correct copy of the Contract #3 is attached hereto and marked as **Exhibit "B**."

28. CCIA executed change orders to Bedwell authorizing performance of additional work and/or altered work in the amount of $4,890,149.41 on Contract #3, thereby increasing the total adjusted sum of $32,365,149.41.

29.     During the course of the Project, CCIA directed, authorized, required and/or demanded that Bedwell perform additional work or altered work valued in the amount of $3,085,078.03, and was not required to use contractual allowances of $305,392.85 for Contract #3, therefore the total value with all change orders and extra work increased to $35,144,834.59.

30.     Contract #2 and Contract #3 (collectively, referred to as the "Contracts") specifically incorporate by reference under §9.1.3 the "Supplementary and other Conditions of the Contract" identified as A201 CMA, the "General Conditions of the Contract for Construction" (the "General Conditions").  A true and correct copy of the General Conditions is attached hereto and marked as **Exhibit "C**."

31.     The Contracts also incorporate by reference the Specifications under §9.1.4 (the "Specifications").

32.     The Contracts also incorporate by reference the Drawings under §9.1.5 (the "Drawings").

33.     The Contracts also incorporate by reference the Addenda under §9.1.6 (the "Addenda").

34.     The Specifications, Drawings and Addenda (collectively, referred to as the "Design Documents") that described the work to be done on the Project were drafted and published by HDR.

35.     HDR was aware that the Design Documents would be used by contractors such as Bedwell to formulate prices and estimates upon which bids would be submitted in an effort to obtain a public contract.

36.     HDR was aware that the Design Documents would be used by contractors such

as Bedwell to perform work necessary to construct the project.

37.    The only citation to a "schedule" within the Design Documents occurs in the Specifications at Section 01 32 13, Subsection 1.3, titled "Contractor's Construction Schedule."

38.    Section 01 32 13, Subsection 1.3A required Bedwell to "agree to meet the dates and durations as defined in the Contract 3, [Bedwell's] fully coordinated CPM Construction Schedule."

39.    Section 01 32 13, Subsection 1.4A provides that the "Construction Schedule . . . shall be used . . . for . . .3. Basis for evaluating claims."

40.    Section 01 32 13, Subsection 1.5B provides that "If [Bedwell] fails to submit a Recovery Schedule and/or fails to cooperate with the recovery process, [JJS] can immediately order [Bedwell] to accelerate completion of the late activities by whatever means necessary, including additional personnel, equipment, overtime double shifts without any additional cost to to [CCIA]."

41.    Beneath each of the headings reading "Portion of Work" and "Substantial Completion Date" are blank spaces in Paragraph 3.2 of Contract #2.  *See* **Ex. A**, p. 2, §3.2.

42.    Contract #2 provides that "Final Completion" shall be "228 Calendar days from Notice to Proceed."  *See* **Ex. A**, p. 2, §3.2.

43.    Bedwell was required to commence the performance of Contract #3 on February 28, 2011, immediately upon CCIA's issuance of the Notice to Proceed.

44.    Contract #3 listed the Substantial Completion Date ("Substantial Completion") as June 1, 2012.  *See* **Ex. B**, p. 2, §3.2.

45.    Contract #3 indicated that the Final Completion Date ("Final Completion")

would be July 2, 2012.

46. Bedwell's planned performance of Contract #3 required certain sequential work activities and corresponding time restraints to accomplish the Project Bidding/Milestone Schedule which were incorporated into Contract #3 in Specification Section 01 11 00, Summary of Work.

47. Specification Section 01 11 00, Summary of Work provides as follows:

> A project bidding schedule is included at the end of this section (page 12) [sic], which is solely for the purpose of informing the bidders of the "overall" projected schedule and milestone dates. A "Construction" Schedule inclusive of all work required under Contracts 3-6 will be developed by the Contract 3 Contractor upon contract award per other section of this Specification.

48. The anticipated Project management format was to be Design-Bid-Build, as depicted by the absence of any CCIA/HDR design, redesign or any design milestones whatsoever contained in the Project Bidding/Milestone Schedule included with each of the bid package documents used by CCIA in procuring Prime Contractors.

49. The Project Bidding/Milestone Schedule indicates that the only work on the Project that was expected to occur after June 1, 2012 consisted of punch list and close-out work.

**PERFORMANCE**

50. Bedwell obtained feedback from other Prime Contractors and prepared the Contract #3 project baseline schedule ("Project Baseline Schedule"), referenced as C300, LT-63, dated February 28, 2011, in accordance with their obligations under Specification Section 01 11 00.

51. Bedwell went on to generate twelve (12) subsequent updates of the project schedule over the course of the Project's construction.

52.     From its inception, the Project was plagued by delays due to defects in the Design Document and other circumstances that were beyond Bedwell's control.

53.     Bedwell was unable to maintain that sequential installation of work activities that it had anticipated in order to achieve the Project Bidding/Milestone Schedule contained in the Contract #3 bid documents due to the sheer quantity of changes to the Project's design.

54.     The actual construction of the Project did not conform to the Design-Bid-Build management format which had been indicated in the bid documents and which Bedwell had anticipated in calculating its bid.

55.     The actual construction of the Project was executed on a Fast-Track management format.

56.     Bedwell prepared Schedule Update No. 1, dated May 31, 2011, which indicated that the Project had already fallen behind by 26 calendar days.

57.     JJS immediately demanded that Bedwell create a recovery schedule in order to maintain the targeted Final Completion Date of July 2, 2012.

58.     As required by Specification Section 01 32 13, Subsection 1.5B, Bedwell issued a recovery schedule.

59.     Bedwell's recovery schedule maintained the Final Completion Date of July 2, 2012 by compressing and overlapping all required work activities, thereby stacking the trades in various locations on the Project.

60.     Bedwell prepared Schedule Update No. 2, dated June 30, 2011, which indicated that the Project had fallen behind by 22 calendar days.

61.     JJS again demanded that Bedwell create a recovery schedule.

62.     Bedwell again issued a recovery schedule featuring work activities which were even more compressed without addressing the underlying issues behind the Project's delay.

63.     The monthly identification of the Project delay and re-sequencing of the Project schedule continued through Schedule Update No. 6, dated October 31, 2011.

64.     On October 31, 2011, CCIA authorized the acceleration of the Project starting a six (6) day work week for certain work activities.

65.     As of Schedule Update No. 6, dated October 31, 2011, the Project's critical path ran through the first floor Auditorium.

66.     As of Schedule Update No. 7, dated November 30, 2011, the Project's critical path had changed to now run through the sixth floor Mechanical Electrical Plumbing ("MEP").

67.     As of Schedule Update No. 8, dated December 31, 2011, the Project again showed 23 calendar days of delay.

68.     JJS again demanded a recovery schedule to preserve the target Final Completion date of July 2, 2012.

69.     Bedwell's re-sequenced schedule issued in response to JJS's demand now indicated three (3) parallel critical paths on the Project running through the first floor finishes, the fifth floor finishes and the penthouse MEP requirements.

70.     As of Schedule Update No. 9, dated January 31, 2012, the Project showed 25 calendar days of delay and five (5) parallel critical paths running through Floors 1, 4, 5, 6 and the penthouse.

71.     By Schedule Update No. 11, dated March 31, 2012, the Project had seven (7) parallel critical paths.

72.     The aggregate number of delay days from Bedwell's twelve schedule updates totaled 425 calendar days.

73.     This intense compression of work activities and the introduction of a six (6) day work weeks for some activities had not remedied the underlying delay issues which burdened the Project.

74.     The Project was impacted by an abnormally large quantity of design changes, schedule disputes, schedule disruptions and work activity interference.

75.     Bedwell obtained Substantial Completion for the Project on July 24, 2012, or seven and a half (7.5) weeks after the target date of June 2, 2012.

76.     Despite the delay information contained in Bedwell's twelve schedule updates, JJS never issued any official extension to the Project schedule.

77.     The Design Documents prepared by HDR prompted two hundred twelve (212) Requests for Information ("RFI's") from Bedwell on Contract #3 alone.

78.     Bedwell could not proceed with the installation the work associated the subject of an asked RFI, until the RFI had been resolved by HDR/JJS.

79.     JJS issued one hundred twenty (120) Field Notices ("FN") on the Project to the Prime Contractors.

80.     The first ten (10) of these FNs pertained to the base structure work under Contract #2, yet the subsequent one hundred ten (110) FN involved the Prime Contractors for the finished construction of the Project.

81.     The FN contained the addition of over one thousand six hundred (1,600) pages of written narrative, and five hundred ninety-three (593) pages of drawings and/or sketches.

82.     The defective Design Documents that had been incorporated into Contract #3 required Bedwell to submit four hundred sixty-nine (469) Change Order Proposals ("COP").

83.     Per the General Conditions which were incorporated into Contract #3, Bedwell was required to provide "written notice" if it believed that additional cost was due to comply with any RFI or FN, before proceeding with the directive.  *See* **Ex. C**, p. 30, §4.7.7.

84.     After being denied access to the critical work areas and burdened with additional work, Bedwell was unable to complete  its remaining work within the one month anticipated Punch List Period on the Project Bidding/Milestone Schedule, achieving Final Completion for the Project on December 5, 2012, or twenty-two (22) weeks following the target date of July 2, 2012.

85.     As the "General Construction" contractor on the Project, Bedwell was obligated to maintain a presence on site regardless of whether or not the outstanding work that was being performed was part of Bedwell's scope of work under the Contracts.

86.     Bedwell submitted a Request for Equitable Adjustment ("REA") dated February 13, 2013 in support of its COP #467 setting forth $2,535,130 in damages (that was subsequently revised to $2,620,130 on July 29, 2013) for costs incurred on the Project.

87.     Bedwell's REA relates to factual averments and legal contentions which are enumerated in the Paragraphs which follow.

88.     JJS issued a response to the REA ("JJS Response") dated June 2, 2013 which contested the merit and quantity of the REA.

89.     Bedwell, by and through its agent Metropolitan Engineering Associates, Inc. ("MEA"), submitted a rebuttal report ("MEA Rebuttal Report") dated July 29, 2013 which

responded to the points that had been asserted in the JJS Response.

90.     Upon information and belief, CCIA has issued no written decision favorable to Bedwell concerning its REA in support of its COP #467.

91.     Upon information and belief, JJS has issued no written decision favorable to Bedwell concerning its REA in support of its COP #467.

92.     Upon information and belief, HDR has issued no written decision favorable to Bedwell concerning its REA in support of its COP #467.

**COUNT I**
**BREACH OF CONTRACT AS TO**
**CAMDEN COUNTY IMPROVEMENT AUTHORITY ON CONTRACTS #2 AND #3**

93.     Bedwell incorporates by reference all preceding paragraphs of this Complaint as though set forth at length herein.

94.     In preparing its bid proposal for completing the work identified in the Contracts, Bedwell carefully examined all of the Design Documents and prepared its competitive bids for the Project in strict accordance with the Design Documents which anticipated a Design-Bid-Build Project management format.

95.     CCIA had an obligation to furnish complete, accurate Design Documents and that the construction of the Project would progress on time and in an orderly, coordinated, and expeditious manner via a Design-Bid-Build format without undue delay, disruption, and/or interference.

96.     Bedwell has completed its obligations to perform the construction activities under the Contracts, but CCIA has breached by refusing to pay Bedwell the sums to which it is entitled.

97.     CCIA has further breached the Contracts by insisting upon a Fast-Track management format in variance with the anticipated Design-Bid-Build methodology which the bid documents had directed.

98.     Bedwell entered into the Contracts in the reasonable reliance that the Project's Design Documents would be sufficient to allow the Project to be constructed in an efficient and orderly manner necessary to achieve the incorporated Project Bidding/Milestone Schedule.

99.     CCIA has further breached the Contract by providing deficient Design Documents which prevented Bedwell from prosecuting its work in accordance with the plan directed in the bid documents.

100.    As a result of CCIA's breaches, Bedwell incurred damages in the following forms:

a)      lost productivity of construction work caused by the unavoidable schedule delays and interruptions in construction work activities which were the necessary consequence of CCIA's attempts to compress the schedule;

b)      cost of extended time to perform the scope of the Contracts caused by CCIA's repeated interference and disruption to Bedwell's construction work activities as it attempted to remedy its deficient Design Documents;

c)      uncompensated cost to furnish and install extra work beyond what was owed in the Contracts' Design Documents; and

d)      extended Project duration costs to maintain an on-site presence beyond the target dates which had been incorporated into the Contracts.

101.    Bedwell has demanded payment repeatedly in the REA and MEA Rebuttal Report, but CCIA has not responded.

102.    Bedwell is entitled to payment in full by CCIA for work performed under the Contracts and for all of the costs incurred.

**WHEREFORE**, Plaintiff, Bedwell, respectfully requests this Honorable Court to enter a judgment in its favor and against CCIA, awarding Bedwell an amount in excess of $3,887,557.30, plus unpaid balance or retainage owed of $651,194.46 under the Contracts, as well as interest, counsel fees, costs of suit, and any further relief which this Court deems just and proper.

**COUNT II**
**BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING AS TO CAMDEN COUNTY IMPROVEMENT AUTHORITY**

103.    Bedwell incorporates by reference all preceding paragraphs of this Complaint as though set forth at length herein.

104.    Bedwell and CCIA were parties to the legally binding Contracts referenced herein.

105.    CCIA knew or should have known that Bedwell would rely on the provision of complete and sufficient Design Documents, and the Design-Bid-Build format that was directed in the Project Bidding/Milestone Schedule contained in the bid documents.

106.    CCIA acted, or directed its authorized agents to act, in bad faith to administer the Project in a materially different method that had been portrayed in the bid documents.

107.    As a result of CCIA's breach of the covenant of good faith and fair dealing, Bedwell incurred damages in the following forms:

a) lost productivity of construction work caused by the unavoidable schedule delays and interruptions in construction work activities which were the necessary consequence of CCIA's attempts to compress the schedule;

b) cost of extended time to perform the scope of the Contracts caused by CCIA's repeated interference and disruption to Bedwell's construction work activities as it attempted to remedy its deficient Design Documents;

c) uncompensated cost to furnish and install extra work beyond what was owed in the Contracts' Design Documents;

d) extended Project duration costs to maintain an on-site presence beyond the target dates which had been incorporated into the Contracts; and

e) lost profits to which it could have reasonably expected to gain had the Contracts been administered in the manner that was portrayed in the bid documents.

**WHEREFORE**, Plaintiff, Bedwell, respectfully requests this Honorable Court to enter a judgment in its favor and against CCIA, awarding Bedwell an amount in excess of $3,887,557.30, plus retainage of $651,194.46, interest, counsel fees, costs of suit, and any further relief which this Court deems just and proper.

**COUNT III**
**FRAUDULENT INDUCEMENT AS TO**
**CAMDEN COUNTY IMPROVEMENT AUTHORITY**

108. Bedwell incorporates by reference all preceding paragraphs of this Complaint as though set forth at length herein.

109.    CCIA intentionally misrepresented in the bid documents, or directed its authorized agent to misrepresent, that complete and sufficient Design Documents would be issued with the Contract #3 such that the awarded contractor could complete its scope of work consistent with the provided Project Bidding/Milestone Schedule.

110.    This misrepresentation was material because Bedwell's proposed bid for Contract #3 was reasonably reliant on the carefully planned, sequential installation of work activities that was necessary to achieve the Project Bidding/Milestone Schedule contained in the Contract #3 bid documents.

111.    As a result of CCIA's fraudulent inducement, Bedwell incurred, or will incur, damages in the following forms:

a)    lost productivity of construction work caused by the unavoidable schedule delays and interruptions in construction work activities which were the necessary consequence of CCIA's attempts to compress the schedule;

b)    cost of extended time to perform the scope of the Contracts caused by CCIA's repeated interference and disruption to Bedwell's construction work activities as it attempted to remedy its deficient Design Documents;

c)    uncompensated cost to furnish and install extra work beyond what was owed in the Contracts' Design Documents;

d)    extended Project duration costs to maintain an on-site presence beyond the target dates which had been incorporated into the Contracts; and

e)    potential institution of liquidated damages by CCIA under Contract #3.

**WHEREFORE**, Plaintiff, Bedwell, respectfully requests this Honorable Court to enter a judgment in its favor and against CCIA, deeming the liquidated damage provisions of Contract #3 void, and awarding Bedwell an amount in excess of $3,887,557.30, plus retainage of $651,194.46 , interest, counsel fees, costs of suit, and any further relief which this Court deems just and proper.

**COUNT IV**
**UNJUST ENRICHMENT AS TO**
**CAMDEN COUNTY IMPROVEMENT AUTHORITY**

112.     Bedwell incorporates by reference all preceding paragraphs of this Complaint as though set forth at length herein.

113.     Bedwell has fully complied with the terms of the Contracts and completed work required by the Contracts valued in the amount of $50,624,467.78.

114.     To date, Bedwell has only been paid the sum of $46,085,716.02 in payments under the Contracts by CCIA.

115.     CCIA, having received the work provided by Bedwell, for its use and benefit has been unjustly enriched, while Bedwell has unfairly impoverished.

**WHEREFORE**, Plaintiff, Bedwell, respectfully requests this Honorable Court to enter a judgment in its favor and against CCIA, awarding Bedwell an amount in excess of $4,538,751.76, plus any unpaid balance or retainage owed under the Contracts, as well as interest, counsel fees, costs of suit, and any further relief which this Court deems just and proper.

**COUNT V**
**QUANTUM MERUIT AS TO**
**CAMDEN COUNTY INMPROVEMENT AUTHORITY**

116.     Bedwell incorporates by reference all preceding paragraphs of this Complaint as though set forth at length herein.

117.    Bedwell has provided valuable material and performed work and services for the benefit of CCIA.

118.    The fair market value of Bedwell's work performed for which it has not been paid is $4,538,751.76, plus any unpaid balance or retainage owed under the Contracts, not including any disputed backcharges

**WHEREFORE**, Plaintiff, Bedwell, respectfully requests this Honorable Court to enter a judgment in its favor and against CCIA, awarding Bedwell an amount in excess of $4,538,751.76, plus any unpaid balance or retainage owed under the Contracts, as well as interest, counsel fees, costs of suit, and any further relief which this Court deems just and proper.

**COUNT VI**
**PROMPT PAYMENT LAW AS TO**
**CAMDEN COUNTY IMPROVEMENT AUTHORITY**

119.    Plaintiff repeats each and every preceding paragraph as if set forth at length herein.

120.    Under the New Jersey Prompt Payment Law, *N.J.S.A.* 2A:30A-1 *et seq.* (the "PPL") CCIA was obligated to pay Bedwell within thirty (30) calendar days of receipt of each Bedwell's Application and Certificate for Payment ("Invoice") unless CCIA provides, before the end of a 20 day period, a written statement of the amount withheld and the reason for withholding payment.

121.    Bedwell submitted an Invoice 23 on June 21, 2013 in the amount of $320,597.56.

122.    As of the date of this complaint, CCIA has not responded to in writing to Invoice 23, therefore Invoice 23 was deemed certified and payment was due to Bedwell 10 days after the expiration of the 20 days from the date of the invoice.

123.    CCIA's failure to pay Invoice 23 for Contract #3 in the amount of $320,597.56 within 10 days of it being certified is a violation of the PPL.

**WHEREFORE**, Plaintiff, Bedwell, respectfully requests this Honorable Court to enter a judgment in its favor and against CCIA, for contractual damages of $4,538,751.76, plus statutory interest under the New Jersey Prompt Payment Law, compensatory damages, counsel fees, costs of suit, and any further relief which this Court deems just and proper.

## COUNT VII
## NEGLIGENCE, WANTONNESS, WILLFULLNESS, RECKLESSNESS, AND INTENTIONAL MISCONDUCT AS TO HDR ARCHITECTURE, INC.

124.    Bedwell incorporates by reference all preceding paragraphs of this Complaint as though set forth at length herein.

125.    HDR prepared all Design Documents for the Project.

126.    HDR knew the Design Documents that HDR prepared were to be furnished to contractors such as Bedwell for the purpose of bidding the Project.

127.    HDR owed a duty to bidders to supply them with drawings properly prepared in accordance with the standard of the profession and in compliance with code requirements.

128.    Bedwell properly relied upon the Design Documents in preparing its bid.

129.    HDR was negligent in the preparation of the Design Documents.

130.    HDR acted outside of its contractual relationship with UMDNJ/Rowan/CCIA.

131.    HDR negligently, wantonly, willfully, recklessly and/or intentionally acted or failed to act for its own personal gain and advancement so as to make Bedwell the scapegoat to cover HDR's design defects.

132.    HDR failed to perform the industry standard due diligence and coordination of the drawings and specifications, as was required regarding the Contract, prior to furnishing such to contractors for bidding purposes.

133.    The rights of Bedwell were tortuously injured by HDR's actions, and HDR caused economic harm and monetary damages to Bedwell.

134.    Bedwell's damages were foreseeable by HDR.

135.    The negligent, wanton, willful, reckless and/or intentional acts or failures to act as well as other liability-producing conduct of HDR proximately caused the economic harm and monetary damages sustained by Bedwell.

**WHEREFORE**, Plaintiff, Bedwell, respectfully requests this Honorable Court to enter a judgment in its favor and against HDR, awarding Bedwell an amount in excess of $4,538,751.76, plus any unpaid balance or retainage owed under the Contracts, as well as interest, punitive damages, consequential damages, counsel fees, costs of suit, and any further relief which this Court deems just and proper.

**COUNT VIII**
**TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS AS TO**
**HDR ARCHITECTURE, INC.**

136.    Bedwell incorporates by reference all preceding paragraphs of this Complaint as though set forth at length herein.

137.    Bedwell had a reasonable expectation of an economic benefit from its Contract with CCIA.

138.    HDR had knowledge of Bedwell's expectancy.

139.    HDR negligently, wantonly, willfully, recklessly, wrongfully, and intentionally interfered with Bedwell's contractual relation with CCIA.

140.    There was a reasonable probability that Bedwell would have received the anticipated economic benefit absent such interference.

141.    The rights of Bedwell were tortuously injured by HDR's actions, and HDR caused economic harm and monetary damages to Bedwell.

142.    Bedwell was damaged by HDR's tortious interference.

**WHEREFORE**, Plaintiff, Bedwell, respectfully requests this Honorable Court to enter a judgment in its favor and against HDR, awarding Bedwell an amount in excess of $4,538,751.76, plus any unpaid balance or retainage owed under the Contracts, as well as interest, punitive damages, consequential damages, counsel fees, costs of suit, and any further relief which this Court deems just and proper.

## COUNT IX
## NEGLIGENT MISREPRESENTATION OF BUSINESS INFORMATION AS TO HDR ARCHITECTURE, INC.

143.    Bedwell incorporates by reference all preceding paragraphs of this Complaint as though set forth at length herein.

144.    HDR had duties, fiduciary and otherwise, to protect Bedwell from entering into contracts and/or agreements with other parties and/or purchasing equipment and/or goods and/or materials and/or incurring expenses in reasonable reliance on HDR's aforesaid representations.

145.    HDR was negligent in misrepresenting to Bedwell that the Design Documents provided for the Project were sufficient by which to complete the Contracts in accordance with the project management methodology which was directed in the bid documents.

146.    Bedwell was a reasonably foreseeable recipient of the aforesaid information.

147.    Bedwell reasonably relied upon said information to Bedwell's detriment.

148.    More specifically, in reasonable reliance on HDR's representations as aforesaid, Bedwell entered into contracts and/or agreements with other parties and/or purchased equipment and/or goods and/or materials and/or incurred expenses.

149.    HDR knew or should have known that Bedwell reasonably relied to its detriment upon HDR's misrepresentations as aforesaid and to otherwise exercise the duty of care that HDR owed to Bedwell relative to HDR's responsibilities and/or obligations and/or duties existing under the contracts.  Accordingly, said reliance by Bedwell was justifiable, and HDR expected and/or should have expected same.

150.    The aforesaid conduct of HDR constitutes actionable negligence.

151.    Bedwell was damaged by HDR's negligent misrepresentation of business information.

**WHEREFORE**, Plaintiff, Bedwell, respectfully requests this Honorable Court to enter a judgment in its favor and against HDR, awarding Bedwell an amount in excess of $4,538,751.76, plus any unpaid balance or retainage owed under the Contracts, as well as interest, punitive damages, consequential damages, counsel fees, costs of suit, and any further relief which this Court deems just and proper.

## COUNT X
### PROFESSIONAL MALPRACTICE
### AS TO HDR ARCHITECTURE, INC.

152.    Bedwell incorporates by reference all preceding paragraphs of this Complaint as though set forth at length herein.

153.     HDR drafted, signed and sealed the Contract Documents for the Project.

154.     HDR knew, or should have known, that Bedwell was going to rely on the HDR's representation that it had produced a complete set of construction documents sufficient to fully describe the design of the Project.

155.     HDR had a duty to prepare and coordinate the Design Documents which showed all the work required to complete the Project.

156.     HDR owed Bedwell a duty to only publish and provide a seal on Drawings and Specifications which were in accordance with the professional standards which mandate that an architect "shall act with reasonable care and competence, and shall apply the technical knowledge and skill which are ordinarily applied by architects of good standing, practicing in the same locality." *N.J.A.C.* 13:27-5.1.

157.     Bedwell properly relied upon HDR's seal and publishing of the Design Documents in submitting its bids and entering in to the Contracts that the information contained therein was suitably complete and sufficient by which to build the Project.

158.     HDR was negligent in its production, review, verification and seal of the Design Documents.

159.     HDR's negligence was the proximate cause of Bedwell's damages.

160.     Bedwell's damages were foreseeable.

**WHEREFORE**, Plaintiff, Bedwell, respectfully requests this Honorable Court to enter a judgment in its favor and against HDR, awarding Bedwell an amount in excess of $4,538,751.76, plus any unpaid balance or retainage owed under the Contracts, as well as interest, punitive damages, consequential damages, counsel fees, costs of suit, and any further relief which this Court deems just and proper.

## <u>CERTIFICATION PURSUANT TO L. CIV. R. 11.2</u>

The within matter in controversy is not the subject of any other action pending in any court, or of any pending arbitration or administrative proceeding.

.

**STEVEN A. BERKOWITZ & ASSOCIATES, P.C.**

*Electronically filed*

**DATE:**   March 10, 2014

<u>s/Steven A. Berkowitz, Esq.</u>
Steven A. Berkowitz  (0569)
Colin M. Schmitt (5303)
10000 Lincoln Drive East
Suite 202
Marlton, New Jersey 08053
Attorney for Plaintiff
The Bedwell Company